1    **WO**

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                      FOR THE DISTRICT OF ARIZONA

8

9    Scott Curtis Kerns,                    )    No. CV-04-01937-PHX-NVW
                                            )
10                  Plaintiff,              )    **FINDINGS OF FACT AND**
                                            )    **CONCLUSIONS OF LAW**
11   vs.                                    )
                                            )
12                                          )
     United States of America,             )
13                                          )
                    Defendant.              )
14                                          )
                                            )
15   _____   )

16          **TABLE OF CONTENTS**

17   I.    Findings of Fact  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18         A.    Background  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

19         B.    The Misidentification of Scott Curtis Kerns  . . . . . . . . . . . . . . . . . . . . . . 3

20               1.    The Case Officers Relied Upon the Analysts  . . . . . . . . . . . . . . . . . . 3

21               2.    The Duties of the Intelligence Analysts: Suspect Identification  . . . 3

22               3.    The Analysts' Independence  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

23               4.    Step One: Initial Suspect Identification by Administrative
24                     Subpoena  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

25                     i.    Requesting Subscriber Information  . . . . . . . . . . . . . . . . . . 5

26                     ii.   Entering the Identifying Data into the Pen Link Database  . . 5

27                     iii.  Storing the Subpoena Return  . . . . . . . . . . . . . . . . . . . . . . . . 7

28                     iv.   The Limited Role of the Pen Link Database and the
                            Primary Role of the Target Folder . . . . . . . . . . . . . . . . . . . . 7

5.    Step Two: Retrieving Information from the Department of Motor Vehicles by Name Alone . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

6.    Step Three: Creating the Target Folder Without Considering the Subpoena Return . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

     i.    Summarizing the DMV Data . . . . . . . . . . . . . . . . . . . . . . . 10

     ii.    Additional Information Derived from the DMV: DEA Form-202 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

     iii    The Failure to Consult the Subpoena Return for Identification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

7.    Angeline Woolbright's Explanation . . . . . . . . . . . . . . . . . . . . . . . . 12

8.    Standards of Police Practice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

C.    Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

II.    Conclusions of Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

A.    Grossly Negligent Police Investigation . . . . . . . . . . . . . . . . . . . . . . . . 15

1.    The Statutory Law of Qualified Immunity in Arizona . . . . . . . . . 15

2.    The Arizona Common Law Landscape . . . . . . . . . . . . . . . . . . . . 16

3.    Elements of the Tort of Grossly Negligent Police Investigation . . 17

4.    Gross Negligence in the Investigation Leading to the Arrest and Detention of Scott Curtis Kerns . . . . . . . . . . . . . . . . . 18

     i.    Duty Owed by the Intelligence Analysts to Consider the Direct Evidence at Hand when Identifying Suspects . . 18

     ii.    The Grossly Negligent Breach of the Standard of Care . . . 18

     iii.    No Probable Cause to Arrest Plaintiff . . . . . . . . . . . . . . . . . 19

     iv.    Causation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

     v.    Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

B.    False Arrest and False Imprisonment: The Intentional Tort Exception to the Federal Tort Claims Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

C.    The Discretionary Function Exception . . . . . . . . . . . . . . . . . . . . . . . . 24

1.    Legislative Intent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

2.    The Two-Prong Test . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

3.    Step One: The Analysts Exercised Discretion . . . . . . . . . . . . . . . 30

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

          4.      Step Two: The Exercise of Discretion Is Not Shielded from Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

               i.       Section 2680(a) in Law Enforcement Investigations . . . . . 30

               ii.      The Reported Decisions . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

               iii.     The Specific Facts of This Case . . . . . . . . . . . . . . . . . . . . 34

    D.      Entitlement to Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

1    Plaintiff Scott Curtis Kerns brings this action against the United States of America

2    under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346, for money damages for the

3    wrongful arrest and detention caused by the officers and agents of a federal drug-enforcement

4    task force.  The court held a bench trial from December 12 through 14, 2006, on Plaintiff's

5    claims for grossly negligent police investigation and false arrest and imprisonment.

6    Plaintiff's claim of merely negligent investigation was dismissed at trial.  Having considered

7    the trial evidence and the arguments of counsel, the court enters the following Findings of

8    Fact and Conclusions of Law.

9    **I.    Findings of Fact**

10        **A.    Background**

11        Sometime in 1999, the Drug Enforcement Agency ("DEA"), the United States

12   Customs Service, and the Federal Bureau of Investigation ("FBI") joined with other state and

13   local law enforcement members of the Southwest Border Alliance Task Force to investigate

14   a drug importing crime syndicate operating in and around Yuma, Arizona.  The DEA was

15   the lead agency in what came to be known as "Operation Green Prickly Pear."  The

16   investigation, which came to a close on September 9, 2001, included but was not limited to

17   surveillance, wiretaps, interviews, and undercover operations.

18        In the course of the investigation, an individual later identified as Scott Michael

19   Kernes was overheard on at least three wiretap intercepts discussing issues relating to the

20   drug trafficking conspiracy.  However, the evidence gleaned from these wiretap intercepts

21   did not  result in the arrest of Scott Michael Kernes.  Instead, federal officers arrested Scott

22   Curtis Kerns, a resident of Yuma and the Plaintiff in this matter.  Plaintiff was mistakenly

23   indicted by an Arizona grand jury on January 10, 2002, and apprehended by heavily armed

24   federal agents outside his Yuma home on January 28, 2002.  Although he did not know why

25   he had been arrested, Plaintiff cooperated with the federal officers by, among other things,

26   giving them the keys to his residence.  Federal agents thoroughly searched Plaintiff's home

27   for contraband but found nothing.  The law enforcement officers scattered the contents of

28   Plaintiff's drawers and cabinets in the course of their futile search for narcotics.  Plaintiff was

then transported to the Yuma National Guard Armory for questioning by federal agents, where he joined approximately 29 other alleged members of the drug trafficking conspiracy arrested that day.  After questioning, Plaintiff was detained in the Yuma County Detention Facility and then transported at two in the morning on January 30, 2002, to the Maricopa County Madison Street Jail in Phoenix, Arizona.

Plaintiff Scott Curtis Kerns has no relationship to Scott Michael Kernes.  Plaintiff did not utter the inculpatory statements overheard by members of the Task Force in the wiretap intercepts.  From the moment of his arrest, Plaintiff explained that he was the victim of mistaken identity.  At first his efforts were unavailing.  Then, at the Maricopa County jail on January 30, 2002, Plaintiff had a brief conversation with another arrestee, Shannon Pulda, whom he recognized from high school.  Shannon was involved in the drug trafficking conspiracy along with Scott Michael Kernes, and because she happened to know both Scott Kernes and Scott Kerns, she was able to inform Plaintiff that he was "not the right Scott."

Plaintiff then called Cindy Kerns, who was his girlfriend at the time of his arrest and is now his wife, to tell her about the "other" Scott Kernes.  Cindy confirmed the identity of Scott Michael Kernes by calling the bowling alley where he worked in Yuma.  She then contacted the local DEA office to inform them of their mistaken arrest of Scott Curtis Kerns.  Plaintiff also informed the Maricopa County Superior Court that there was "another Scott Kernes" living in Yuma during his initial court appearance on January 30, 2002.  Billie Rosen, Operation Green Prickly Pear's lead prosecutor, was present at the hearing and was struck by Plaintiff's claim of mistaken identity.  Ms. Rosen asked federal agents to investigate Plaintiff's story.

After reviewing the primary inculpatory data from the wiretap intercepts, federal agents confirmed that they had in fact arrested "the wrong Scott."  Billie Rosen caused Plaintiff to be released from the Maricopa County jail and dismissed, with prejudice, from the narcotics conspiracy case on January 31, 2002, four days after his arrest.

**B.     The Misidentification of Scott Curtis Kerns**

The investigation into the Yuma drug trafficking conspiracy was characterized as absolutely professional and extraordinarily good by Billie Rosen, the lead prosecutor. Indeed, the correct person was arrested in 96 of the 97 cases.  But four intelligent analysts made grave errors in Plaintiff's case.  By their acts and omissions, the Task Force analysts caused law enforcement officers to indict and arrest Scott Curtis Kerns rather than the wanted narcotics co-conspirator, Scott Michael Kernes.  There was no objective or reliable evidence linking Plaintiff to the criminal conduct.  The following findings explain how the analysts' investigation went wrong.

**1.     The Case Officers Relied Upon the Analysts**

Special Agents Carl Geohegan and George Carter, from the FBI and the Customs Service respectively, were the case agents responsible for monitoring the wiretaps for information about the drug trafficking conspiracy.  Geohegan and Carter intercepted over 30,000 phone calls during Operation Green Prickly Pear, working from early morning until midnight, seven days a week, for months at a time.  In some cases, the operational surveillance officers intercepted as many as 1,500 calls per day.  The numerous wiretap intercepts yielded a correspondingly large amount of data, consisting of captured telephone numbers and information relating to the date, time, duration, and type (local, long-distance or cell phone) of each call.  The case agents relied exclusively upon the four intelligence analysts to extract positive suspect identifications from these raw data.  DEA agent Angeline Woolbright, who received formal investigative training from the FBI, was the Operation's lead analyst.  The three other analysts came from the DEA (Cynthia Carlon-Canales), the U.S. Customs Service (Frank Gonzalez), and the Arizona National Guard (Bob Baldwin).

**2.     The Duties of the Intelligence Analysts: Suspect Identification**

The four Task Force analysts were jointly responsible for researching the wiretap data and delivering the name of the person whose statements had been intercepted, along with other points of identification.  The case agents relied exclusively upon the analysts' work product when seeking indictments and effecting arrests of the narcotics conspirators.  There

3

1   was no independent verification of the suspect identifications provided by the analysts.  The

2   analysts established a three-step procedure to identify each suspect.  First, Agent Woolbright

3   and her colleagues made an initial suspect identification by matching the telephone numbers

4   captured by the wiretaps with subscriber information subpoenaed from telephone companies.

5   They used a data management computer program to store the suspect's name and some other

6   primary data extracted from the administrative subpoena returns.  Second, the analysts used

7   the name provided by the telephone companies, and nothing else, to request a photograph and

8   other file data from the Arizona Department of Motor Vehicles ("DMV") in Yuma, Arizona.

9   Lastly, the analysts created a target folder summarizing the data delivered to them by the

10  Yuma DMV and finally identifying the suspect.  The analysts never confirmed the accuracy

11  of their final suspect identification by reference to any of the primary data provided to them

12  by the telephone companies at the first stage of the investigation.  The federal case agents and

13  Arizona prosecutors relied exclusively upon the suspect target folders assembled by the

14  analysts for suspect identifications.

15              **3.      The Analysts' Independence**

16          The analysts performed their duties independently.  Although she was the lead analyst,

17  Agent Woolbright did not exercise supervisory authority over her peers in the intelligence

18  room.  The four analysts shared investigative responsibilities equally amongst themselves.

19  Furthermore, there were no procedural manuals or other written directives defining the

20  analysts' responsibilities in Operation Green Prickly Pear.  The analysts established and

21  implemented their suspect identification policy without formal oversight.  No single case

22  officer was assigned to oversee the analysts.  Instead, each analyst reported directly to his or

23  her supervisor at the DEA, the National Guard, or the U.S. Customs Service, respectively.

24          Three federal intelligence analysts and only one state analyst were assigned to

25  Operation Green Prickly Pear.  The three-to-one ratio of federal to state analysts makes it

26  more likely than not that one of the federal analysts was responsible for each act and

27  omission leading to Plaintiff's arrest and detention.  Moreover, the DEA, the U.S. Customs

28  Service, and the Arizona National Guard analysts were jointly responsible for providing

4

1   suspect identifications to the case agents, rendering each sovereign responsible for the
2   actions and omissions of the analyst team.  Each step of the analysts' suspect identification
3   procedure is analyzed below as it was applied to Plaintiff.

4           **4.      Step One: Initial Suspect Identification by Administrative Subpoena**

5                   **i.      Requesting Subscriber Information**

6           The analysts began each investigation by seeking the subscriber identity for the phone
7   used to initiate or receive each intercepted telephone call.  The analysts sent administrative
8   subpoenas to various telephone companies to obtain this information.  Throughout the course
9   of the Operation, Agent Woolbright and her fellow analysts prepared four to five hundred
10  such subpoenas, with each subpoena containing requests for subscriber information on 15
11  to 20 phone numbers.  The telephone companies responded by faxing the requested
12  information to the intelligence room.  The amount of subscriber data actually produced
13  varied by telephone company.  The analysts relied entirely upon the administrative
14  subpoenas, which formed the only link between the intercepted criminal activity and the
15  suspect.

16          In Plaintiff's case, intelligence analyst Cynthia Carlon-Canales and Special Agent
17  Chris Woolbright (a different person from analyst Angeline Woolbright), both of the DEA,
18  sent an administrative subpoena on June 11, 2001, requesting subscriber information for
19  intercepted cell phone number (520) 580-8248.  (Pl. Ex. 3.)  MCI WorldCom responded to
20  the subpoena on June 13, 2001, providing detailed and correct information about Scott
21  Kernes, the cell phone subscriber.  The subpoena return included six identifying data points
22  for Scott Kernes: 1) name, 2) home address, 3) work, home and cell phone numbers, 4)
23  Social Security number, 5) Arizona driver's license number, and 6) date of birth.  (*Id.*)

24                  **ii.      Entering the Identifying Data into the Pen Link Database**

25          Upon receipt of the subpoena return, the Task Force analysts entered some of the
26  identifying information contained therein into a DEA database called "Pen Link."  Pen Link
27  is a commercially available data management tool that the intelligence analysts used to
28  collect and sort wiretap information.  Angeline Woolbright and the other three analysts

1   received training on how to enter telephone data from the subpoena returns into the Pen Link

2   database. The Pen Link program featured multiple tabs containing data fields for a range of

3   information. The first tab contained fields for first, middle, and last names, phone number,

4   address, and source of the subscriber information. Additional tabs contained fields for more

5   specific identifying data such as known aliases, associates, bank accounts, vehicles, and

6   unique identifiers such as driver's license numbers, FBI numbers, Social Security numbers,

7   dates of birth, height, weight, and physical descriptions.

8       Many of the Pen Link data fields could be completed on the basis of information

9   provided by the telephone companies in the subpoena returns. In general, however, the

10   analysts only completed the data fields located on the first tab of the Pen Link program,

11   which included the suspect's name, phone number, address, and the name of the telephone

12   company that provided the subscriber information. According to Agent Woolbright, the

13   analysts did not have sufficient time to click on the second tab and complete the fields for

14   date of birth, Social Security number, and other uniquely identifying data points for each

15   suspect. Although readily available to the analysts from the subpoena returns, the large

16   amount of data to be processed each day prevented the analysts from inputting unique

17   identifiers into Pen Link. The court accepts this testimony as to the telephone intercepts in

18   general.

19       Following standard analyst procedure, at some point between June 13, 2001, and July

20   17, 2001, one of the analysts retrieved the subpoena return from MCI WorldCom for Scott

21   Kernes and entered the identifying data contained therein into the first tab of the Pen Link

22   database. However, the analyst mistakenly typed the name "Scott Kerns" into the Pen Link

23   database while entering the remainder of Scott Kernes' subscriber information into the first

24   tab of the data management program. This clerical error is illustrated by the Pen Link data

25   report dated November 16, 2001, showing the incorrect name "Kerns, Scott" next to Scott

26   Kernes' true address, 533 19th Avenue, Yuma, Arizona. (Def. Ex. 21.) This error was

27   compounded by the analysts' policy of not entering any additional identifying information

28   beyond the suspect's name, phone number, and address into Pen Link. Although the analysts

1  conceived of Pen Link as an "evolving database," which could be updated and changed as
2  additional information about a particular suspect was uncovered, Scott Kernes' Social
3  Security number, Arizona driver's license number, and date of birth were never entered into
4  the program, and the misspelling of his name was never corrected.

### iii.    Storing the Subpoena Return

6      After inputting the limited subscriber data from the subpoena return into Pen Link, the
7  analysts placed the telephone company records in a four-drawer filing cabinet located in a
8  central file room down the hall from the intelligence room.  The subpoena returns were filed
9  in chronological order according to the date received.  Twenty to thirty minutes were
10 required to retrieve the telephone records for a particular suspect from the subpoena return
11 file room.  However, later subpoena return retrieval formed no part of the analysts'
12 investigative procedure.  The analysts made their initial suspect identification by subpoena
13 return and selective Pen Link data entry.  From that point on, the Pen Link database was
14 assumed to be a reliable proxy for the telephone records it incompletely summarized.  The
15 analysts, citing time constraints, made no attempt at any point in the investigation to check
16 the data contained in the computer program against the underlying inculpatory data in the
17 subpoena return.  The subpoena return was the only link between the criminal conduct
18 observed and the person indicted for that conduct.

19     Scott Michael Kernes' subpoena return was treated like all of the others.  His
20 telephone  records were stored in the file room after one of the analysts mistyped his name
21 as "Scott Kerns," but accurately completed the balance of the data fields contained in the first
22 tab of Pen Link.  The subpoena return plainly inculpating Scott Michael Kernes and
23 exculpating Plaintiff was not retrieved or reviewed until Billie Rosen asked federal agents
24 to investigate the possibility of Plaintiff's mistaken arrest on January 30, 2002.

### iv.    The Limited Role of the Pen Link Database and the Primary Role of the Target Folder

27     The analysts' failure to complete any data fields beyond those contained in the first
28 tab of Pen Link is consistent with the limited role of that database in Operation Green Prickly

Pear. Pen Link was used exclusively by the analysts. Agent Woolbright and her colleagues used the database to manage the large volume of telephone data provided by the case agents, and to extract initial investigative leads from the raw data. For example, they used Pen Link to generate "frequency reports," which gave the analysts information about the total number of times that a given number was called during a specified date range. (Def. Ex. 21.) Most importantly, the analysts used the suspect name stored in Pen Link to request additional identifying data from the Arizona Department of Motor Vehicles, as will be discussed below.

Pen Link was not a case management system. The database was not designed to store the information that would be used to seek suspect indictments and prosecutions. This was the function of the "target folder," which was a paper folder containing the results of the analysts' investigation. The target folder contained a summary of the identifying data retrieved from the Arizona DMV, other documents derived from the records of the Motor Vehicles Department, criminal history records, vehicle registrations, and commercially available credit reports. Significantly, the analysts chose not to place a copy of the administrative subpoena return in the target folder. The subpoena return data summarized in Pen Link were also excluded. As a result, Special Agent Carter used entirely secondary information, not primary telephone data, to indict and apprehend each alleged member of the drug trafficking conspiracy.

### 5. Step Two: Retrieving Information from the Department of Motor Vehicles by Name Alone

The intelligence analysts used the information stored in the Pen Link database to obtain further data on the identity of the suspected drug traffickers from the Arizona Department of Motor Vehicles. The initial reason given for seeking driver's license files was to obtain a photograph so that the agents could recognize their suspects. The analysts prepared hand-written lists of suspect names from the Pen Link database, and then gave these lists to Arizona Department of Safety Officer Brian Turner. Officer Turner used the names provided by the intelligence analysts to obtain a printout of each suspect's Arizona driver's license record, which included the person's full name, driver's license number, date of birth,

1    home address, sex, eye color, height and weight, along with a color photograph of the suspect

2    stored on a computer disc.  (Pl. Ex. 6.)

3        In Plaintiff's case, one of the intelligence analysts provided the name "Scott Kerns,"

4    without more, to Arizona Department of Safety Officer Turner on July 17, 2001.  Whenever

5    time permitted, Agent Woolbright included a unique identifier in addition to a name when

6    making requests to the DMV.   But this was not standard analyst procedure, and it did not

7    occur in this case.  Plaintiff's mistaken arrest and prolonged detention became recklessly

8    probable when the analyst failed to include in the request for controlling identifying

9    information for "Scott Kerns" the suspect's Social Security number or Arizona driver's

10   license number, and failed to compare the DMV return to the telephone subpoena return.  Mr.

11   D.P. Van Blaricom, a credible expert in police investigative practices, testified that

12   misidentification is likely when a positive suspect identification is sought in the absence of

13   at least one unique identifier. If a unique identifier had been provided to Officer Turner, he

14   would have retrieved the correct suspect's records from the DMV, notwithstanding the fact

15   that he was given the incorrect name, "Scott Kerns."  But this is not what happened.

16       Agent Woolbright urged a different interpretation of the facts at trial.  She contended

17   that the name "Scott Kernes" was entered correctly into Pen Link at the outset of the

18   investigation.  She further contended that her team was thrown off by a Department of Motor

19   Vehicles employee who mistakenly retrieved Arizona driver's license records for Plaintiff

20   rather than for Scott Michael Kernes.  Believing this information to be correct, she inferred

21   that one of the analysts later replaced the name "Scott Kernes" in the Pen Link database with

22   "Scott Kerns," but did not change the suspect's address to conform with the data retrieved

23   from the Yuma DMV.

24       The Government could not reconstruct the Pen Link database for Operation Green

25   Prickly Pear.  Precisely when the name "Scott Kerns" was entered into the computer program

26   remains uncertain.  However, it is improbable that the error was committed by a DMV

27   employee researching the name "Scott Kernes," as that name would have yielded the true

28   suspect.  It is also improbable that the analysts would have taken the time to change the

spelling of the name in Pen Link upon receipt of the wrong driver's license record, yet leave the address field unmodified.  It is more likely that the name was misspelled in the analysts' request to the DMV.  Applying the maxim that the simplest explanation for an event is more likely the correct explanation, it is more likely than not that the data entry error was committed by the intelligence analysts at the first stage of the investigation when they confronted a large number of suspects and were working under time pressure as well.

**6.    Step Three:  Creating the Target Folder Without Considering the Subpoena Return**

**i.    Summarizing the DMV Data**

Following her standard procedure, Angeline Woolbright created a Microsoft Word document summarizing Scott Curtis Kerns' driver's license records sometime between July 17, 2001, and July 27, 2001.  The document contained a computer image of Plaintiff, along with his date of birth and driver's license number.  (Def. Ex. 24.)  The analyst printed the Word document, affixed one copy to the wall of the wire room for use by operational surveillance officers, and placed another copy in the Scott Kerns target folder.  The stated purpose for seeking the DMV records was just to obtain a suspect photograph.  Yet the driver's license data were the only identifying data included in the suspect folder, and the only data the analysts ever again considered.  Though there was no plan for doing so, in effect the Task Force analysts completely ousted the persona from the telephone subpoena return for the persona on the driver's license.  This ouster caused Special Agent Carter to testify before the Arizona grand jury seeking Plaintiff's indictment.

**ii.    Additional Information Derived from the DMV: DEA Form-202**

A Personal History Report (DEA Form-202) was generated for Plaintiff, rather than for the actual suspect, on August 29, 2001. (Def. Ex. 18.)  This document contained detailed identifying information for Scott Curtis Kerns, all of which was retrieved from the Yuma DMV by the intelligence analysts on August 29, 2001.  The Form-202 was placed on top of Plaintiff's DMV summary and the other identifying information contained in the Scott Kerns target folder.

10

### iii.     The Failure to Consult the Subpoena Return for Identification

The mistaken identity retrieved from the Yuma DMV was never checked against the primary telephone company data summarized in Pen Link or the subpoena return stored in hard copy in the file room.  Having solicited unique data from the telephone company at the first stage of the investigation, the analysts made their final suspect identification based only upon a name, and a misspelled one.  A name alone is an inherently unreliable point of identification, as Mr. Van Blaricom credibly testified, and reliance on a name alone for indictment and arrest is grossly unjustifiable when unique identifiers, such as a Social Security number or a driver's license number, are at hand.

Even accepting the analysts' contention that time constraints precluded them from spending the 20 to 30 minutes required to retrieve the telephone company records from the file room in every case, their exclusive reliance upon DMV identities based on a name alone was grossly negligent in the case of actual indictments obtained in non-exigent circumstances.  The large amount of data to be processed each day restricted the volume of information that the analysts copied from the subpoena return into Pen Link.  But even so, the analysts themselves believed that some quantum of data beyond a suspect's name was necessary.  Otherwise they would not have taken the time to enter Scott Kernes' true address–533 19th Avenue, Yuma, Arizona–into Pen Link.  Yet Plaintiff's home address–12706 S. Avenue B, Yuma, Arizona–supplanted that address without further inquiry. The DMV records in the target folder could be checked against the Pen Link data for a particular suspect in just five to ten minutes.  Special Agent Carter testified that it was inconceivable to him that such a check had not been performed by his analysts at some point prior to his testimony to the grand jury on the identity the analysts provided him.  Yet no check was ever performed.

There were no exigent circumstances, or any time constraints whatsoever, that might explain the analysts' failure to consult the primary identifying data already in their possession before seeking indictment.  Plaintiff's target folder was complete as of August 29, 2001, the

11

1  date the Personal History Report (DEA Form-202) was generated.  Special Agent Carter

2  appeared before the Arizona grand jury to seek Plaintiff's indictment on January 10, 2002.

3  The analysts spent the intervening four months in painstaking data analysis, working

4  alongside the case agents and Arizona prosecutor Billie Rosen to winnow the large number

5  of potential suspects down to the 97 individuals indicted.

6  **7.    Angeline Woolbright's Explanation**

7       The analysts in this case were not conscious of the differences–in name as in

8  everything else–between the subpoena return and the driver's license precisely because they

9  never looked back to the Pen Link database or the telephone records.  Even if they had been

10  conscious of such differences, the apparent effect of Angeline Woolbright's testimony was

11  that she and her fellow analysts would have looked no further, would have assumed that the

12  identifying data provided by the Motor Vehicles Department were always correct, and would

13  have sought indictment of the person on the driver's license.  According to her, the records

14  from the Yuma DMV were believed to be more reliable than those provided by the telephone

15  companies in the subpoena returns, making a cross-check against the primary data

16  unnecessary.  If this was the intent of her testimony, the court is not persuaded by it.  That

17  the analysts believed DMV identifications were always correct and that they declined to

18  compare DMV identifications against primary inculpatory identifications already in their

19  possession out of confidence in DMV infallibility is refuted by Agent Woolbright's own

20  experience.

21       In support of her view, analyst Woolbright testified that, of the 200 to 300 DMV

22  records retrieved over the course of Operation Green Prickly Pear, minor differences between

23  the spelling of the name in the subpoena return as entered into Pen Link and the name

24  provided by the Yuma DMV were discovered approximately 20 to 30 percent of the time.

25  Many suspects changed the spelling of their names when registering for cell phone services

26  in an attempt to mislead law enforcement officers.  A one letter difference between the name

27  on a driver's license and the name of the cell phone subscriber would not cue her to check

28  the two data sources for other identifiers; the DMV identity always prevailed, without

12

1   inquiry.  Out of the many investigations that Agent Woolbright handled, and in her
2   experience as a DEA analyst getting returns back not just in this case but in many others, it
3   was very rare for a minor spelling inconsistency in a suspect's name to generate data sets for
4   two different people. Without doubting the correctness of this specific testimony, it is plainly
5   irrelevant to the facts of this case, where every single datum on the driver's license was
6   different from the corresponding datum in the subpoena return.

7       Agent Woolbright's assumption of universally correct identities from the driver's
8   license data, so as to excuse consideration of the more direct identifying data at hand, was
9   disproved by her own experience.  In one other instance, she provided a name to the Yuma
10  DMV and a completely different name came back to the intelligence room.  This apparently
11  led her to retrieve the suspect's subpoena return from the file room, which showed the
12  driver's license to be of a different person.

13      The court therefore finds that the analysts' ouster, without consideration, of the Pen
14  Link data and the subpoena return in favor of the driver's license identification was not
15  grounded in belief in the universal correctness of the DMV identifications.  The failure to
16  compare the derivative identifying data with the primary identifying data, resulting in *de*
17  *facto* abandonment of the primary identifying data, was done without reflection.  If the
18  analysts had weighed the benefit and the effort of checking the primary identifying data–and
19  the court finds that they did not–they might have thought that the primary data would almost
20  always confirm the DMV identification, making the risk of misidentification acceptably low.
21  But the fact that the correct patient is almost always wheeled into the operating room does
22  not make it anything less than gross negligence for a surgical team to decide not to read the
23  name on the patient's wrist band before making the first incision.

24              **8.   Standards of Police Practice**

25      As testified to by Mr. Van Blaricom, standard police investigative practices were
26  violated when the analysts solicited an identification from the Department of Motor Vehicles
27  on the basis of a suspect's name alone, and then failed to check the identity against the
28  unique identifying  data already in their possession.  As a result, Plaintiff was indicted and

1   arrested on the basis of a mistaken name alone, without consideration of the conclusively

2   exculpatory data that the analysts had subpoenaed, retained, and could have reviewed with

3   five to thirty minutes of effort.  The same confirmation for all 97 persons indicted could have

4   been performed in eight to 49 hours, a trivial expenditure in light of the scope of Operation

5   Green Prickly Pear.

6            **C.**    **Damages**

7          Plaintiff was profoundly affected by his arrest and detention.  He was not able to

8   return to his home for eight months after his release from the Maricopa County Jail, choosing

9   to live instead at the home of Cindy Kerns, his girlfriend at the time.  Plaintiff rarely if ever

10   left Cindy's home during those eight months.  He stayed indoors with the blinds closed,

11   refusing to answer the phone, watching television, and keeping his distance from his family

12   and friends.  Plaintiff remained troubled even after returning to his home.  Plaintiff decided

13   to seek medical attention in 2004 when his psychological trauma manifested itself physically

14   in the form of severe migraine headaches.   On January 16, 2004, he began receiving

15   psychotherapy for post-traumatic stress disorder ("PTSD") from Nada Cox, a licensed

16   clinical social worker who diagnosed his condition.  Plaintiff's PTSD is a permanent

17   condition that was triggered by the events of January 28, 2002, through January 31, 2002.

18   Ms. Cox's treatment, which continued until May 30, 2006, was designed to help Plaintiff

19   cope with the enduring physical and psychological ramifications of his mistaken arrest and

20   detention.  Plaintiff continues to have difficulties sleeping, communicating with his wife,

21   children, and extended family, and interacting with his friends.

22          Plaintiff's reputation was also harmed by his arrest and detention.  Yuma is a small

23   community, and many of Plaintiff's friends heard about his arrest by word of mouth.

24   Plaintiff's name also appeared on the front page of the local newspaper, the Yuma Sun, under

25   the heading "Busted."  His picture was displayed on the local television news shortly after

26   his arrest.  Plaintiff's social dysfunction, which manifested itself only after his release from

27   the Phoenix jail on January 31, 2002, is directly related to the stigma that  attached to his

28   arrest and detention.

1    Plaintiff's damages are $180,000.00 for emotional harm and $20,000.00 for

2    reputational harm, for a total of $200,000.00.  Plaintiff does not claim damages for lost

3    wages, and no damages will be awarded on that basis.

4    **II.      Conclusions of Law**

5    The Federal Tort Claims Act is a limited waiver of the United States' traditional

6    sovereign immunity, authorizing certain tort suits against the Government for monetary

7    damages.  28 U.S.C. § 1346(b).  Under the FTCA, the United States may be liable for the

8    acts or omissions of a federal employee acting within the scope of his office only if a private

9    person would be liable for the same acts or omissions under "the law of the place where the

10   act or omission occurred."  28 U.S.C. § 1346(b)(1); *United States v. Olson*, 126 S. Ct. 510,

11   511 (2006).  The acts and omissions of the federal officers and agents in this case occurred

12   in Arizona.  Accordingly, Plaintiff may recover only if he could hold them personally liable

13   for grossly negligent investigation and/or false arrest and imprisonment under Arizona law

14   on the facts set forth above.

15   **A.      Grossly Negligent Police Investigation**

16   The existence of a cause of action for grossly negligent police investigation under

17   Arizona law is disputed.  This court "must apply what [it finds] to be the state law after

18   giving proper regard to relevant rulings of other courts of the State."  *Comm'r v. Estate of*

19   *Bosch*, 387 U.S. 456, 465 (1967) (internal quotations and citation omitted).   Upon

20   consideration of the applicable statutory and common law, the court finds that the Arizona

21   Supreme Court would recognize a cause of action for grossly negligent police investigation

22   on the facts of this case.

23   **1.      The Statutory Law of Qualified Immunity in Arizona**

24   The Arizona legislature cloaked Arizona public employees acting within the scope of

25   their employment with qualified immunity for the commission of the specific acts or

26   omissions enumerated at A.R.S. § 12-820.02(A). If the public employee's action or inaction

27   comes within this statutory safe harbor, he  may be liable personally only if he "intended to

28   cause injury or was grossly negligent."  A.R.S. § 12-820.02(A).   The statute does not

15

1    expressly grant that limited immunity to state law enforcement officers who conduct police

2    investigations that lead to the arrest and detention of an innocent person.

3        The Arizona Revised Statutes subsequently provide that the legislative grant of

4    qualified immunity at A.R.S. § 12-820.02(A) should not be construed to "affect, alter or

5    otherwise modify any other rule[] of tort immunity regarding . . . public officers as developed

6    at common law." A.R.S. § 12-820.05. Because the Arizona legislature has not stated when

7    personal liability attaches in police investigations, the court must look to Arizona decisional

8    law.

9                **2.    The Arizona Common Law Landscape**

10        In *Cullison v. City of Peoria*, 120 Ariz. 165, 584 P.2d 1156 (1978), the Arizona

11   Supreme Court determined that state law enforcement officers may be personally liable for

12   the grossly negligent prosecution of police investigations. To survive a motion for summary

13   judgment, the plaintiff in *Cullison* was required to show "that the conduct of the police was

14   outside the duty and standard of care required of them in that they had reason to believe that

15   the information on which they based their arrest . . . was not trustworthy." *Id*. at 167, 584

16   P.2d at 1158. The plaintiff's allegation of gross negligence, which turned exclusively on

17   "hearsay, speculation and opinion" impugning the reasonableness of the arresting officer's

18   reliance upon an eyewitness identification, did not meet this exacting standard. *Id*. at 167,

19   584 P.2d at 1158. The police offer was not personally liable for detaining the wrong person

20   because he had probable cause to effect the plaintiff's arrest. The court suggested that a

21   "flagrant violation" of rights guaranteed by the federal and state constitutions, or by the

22   Arizona Rules of Criminal Procedure, was required for a claim of grossly negligent police

23   investigation to lie. *Id*. at 169, 584 P.2d at 1160. The 1978 decision of the Arizona Supreme

24   Court in *Cullison* stands unaffected by the subsequent enactment of A.R.S. § 12-820.02(A)

25   in 1984. A.R.S. § 12-820.05; *see Guillory v. Greenlee County*, 2006 WL 2816600 (D.Ariz.

26   2006) (adjudicating plaintiff's cause of action for grossly negligent police investigation under

27   Arizona law); *Winfrey v. City of Gilbert*, 2006 WL 1602462 (D.Ariz. 2006) (same).

28

In *Landeros v. City of Tucson*, 171 Ariz. 474, 831 P.2d 850 (Ct. App. 1992), the Arizona Court of Appeals had occasion to apply *Cullison*'s holding to a different set of facts. In that case, a police detective obtained a grand jury indictment and arrested an innocent person based on an interview with a juvenile claiming to have personal knowledge of the crime. The arrestee was released from custody when the juvenile's testimony was later discredited. The wrongfully arrested individual sued the arresting officer for grossly negligent investigation of a crime resulting in an arrest. Acknowledging that *Cullison* appeared to grant a remedy in tort, the court nevertheless concluded that the plaintiff had not met the demanding standard of gross negligence previously established by the Arizona Supreme Court. The *Landeros* court also concluded that "the public interest mandates a rejection" of a tort law remedy for "simple negligence" in police investigations. *Id*. at 475, 831 P.2d at 851. The court elaborated by noting:

> The public has a vital stake in the active investigation and prosecution of crime. Police officers and other investigative agents must make quick and important decisions as to the course an investigation shall take. The judgment will not always be right; but to assure continued vigorous police work, those charged with that duty should not be liable for mere negligence.

*Id*. at 475, 831 P.2d 851 (internal quotation omitted).

### 3.    Elements of the Tort of Grossly Negligent Police Investigation

To prove ordinary negligence under Arizona law, Plaintiff must establish that he was owed a duty, that the duty was breached, and that his injuries were proximately caused by that breach. *Morris v. Ortiz*, 103 Ariz. 119, 437 P.2d 652 (1968). "Gross negligence differs from ordinary negligence in quality and not degree." *Walls v. Ariz. Dep't of Pub. Safety*, 170 Ariz. 591, 595, 826 P.2d 1217, 1218 (Ct. App. 1991) (internal citation omitted). In *Cullison*, the Arizona Supreme Court described gross negligence as "highly potent, and when it is present it fairly proclaims itself in no uncertain terms. It is 'in the air,' so to speak. It is flagrant and evinces a lawless and destructive spirit." 120 Ariz. at 169; 584 P.2d at 1160 (citations omitted).

1    **4.    Gross Negligence in the Investigation Leading to the Arrest and Detention of Scott Curtis Kerns**

2

3    **i.    Duty Owed by the Intelligence Analysts to Consider the Direct Evidence at Hand when Identifying Suspects**

4    The standard of care for police identification was articulated at trial by D.P. Van

5    Blaricom, a credible and impressive expert in police investigative practices.    Law

6    enforcement officers must at least consider the evidence at hand in identifying suspects in

7    police investigations. "Any competent police officer is aware of the grave consequences that

8    flow from a misidentification of the wrong person as the perpetrator of the offense."

9    *Schneider v. Simonini*, 749 A.2d 336, 367 (N.J. 2000).  Like police officers, the intelligence

10    analysts responsible for identifying the suspects in Operation Green Prickly Pear are charged

11    with a duty to take precautions against arresting an innocent person. *See Simmons v. United*

12    *States*, 390 U.S. 377, 384 (1968) (requiring reasonably accurate initial identification

13    procedures to spare "innocent suspects the ignominy of arrest").

14    Unique identifiers such as a driver's license or Social Security number are commonly

15    used to provide positive suspect identification in police investigations, and they are

16    especially useful in wiretap investigations.    An innocent person is more likely to be

17    misidentified in a wiretap investigation than in other police investigations.    As Mr. Van

18    Blaricom explained at trial, wiretap investigations begin solely on the basis of a person's

19    disembodied voice and, perhaps, the phone numbers of the individuals making and receiving

20    the intercepted call.    This is different from a typical police investigation in which eye

21    witnesses or other sources of ready identification are available.

22    **ii.    The Grossly Negligent Breach of the Standard of Care**

23    The analysts are not personally liable under Arizona law for their merely negligent

24    misspelling of Scott Kernes' name in Pen Link and in their request for Arizona driver's

25    license data solely on the basis of that misspelled name.  However, gross negligence occurred

26    at the third and final stage of the analysts' investigation into the identity of the subscriber for

27    cell phone number (520) 580-8248.  The analysts were recklessly indifferent when they

28    failed to compare the identity of "Scott Curtis Kerns" as listed in the target folder against the

18

1  primary data incompletely summarized in the Pen Link database.  Even the most cursory

2  check between the two data sets, which could have been performed in just five to ten

3  minutes, would have revealed the discrepancy between the home address for Scott Kerns

4  provided by the Yuma DMV, 12706 South Avenue B, Yuma Arizona, and the subpoena-

5  derived address for Scott Kernes in the Pen Link database, 533 19th Avenue, Yuma Arizona.

6  That review would have led the analysts back to the subpoena return with its multiple unique

7  identifiers conclusively exculpating Plaintiff and inculpating Scott Kernes.  The court, like

8  Special Agent Carter, finds the analysts' failure to act inconceivable.

9          The analysts knew that Special Agent Carter would rely upon the identifying

10  information contained in the target folder when appearing before the grand jury and when

11  arresting the suspect at the address of record.  As law enforcement professionals, the analysts

12  had a duty at least to consider the conclusive evidence actually in their possession.

13  Nevertheless, the analysts never even consulted the primary identifying data that they

14  deemed important enough to subpoena and summarize in the Pen Link database.

15          The court once more notes the total absence of exigent circumstances at the third and

16  final stage of the analysts' investigation.  As discussed above, Plaintiff's target folder was

17  complete as of August 29, 2001, and operational surveillance was terminated for all suspects

18  on September 9, 2001.  From September 2001, until the middle of January 2002, the Task

19  Force analysts and their colleagues methodically reviewed the available evidence for all their

20  suspects.  Agent Woolbright and the other three analysts had an abundance of time to check

21  the address data previously solicited from MCI WorldCom and summarized by them in Pen

22  Link against the plainly inconsistent data provided by the Arizona Department of Motor

23  Vehicles.  Yet no check was ever performed.

24                      **iii.    No Probable Cause to Arrest Plaintiff**

25          Under Arizona law, probable cause is a complete defense to the tort of grossly

26  negligent police investigation.  *Cullison*,  120 Ariz. at 167, 584 P.2d at 1158.  Recovery

27  under *Cullison* requires a showing that the "conduct of the police was outside the duty and

28  standard of care required of them in that they had reason to believe that the information on

1  which they based their arrest [the derivative DMV data], was not trustworthy." *Id*.  As the

2  Arizona Supreme Court recognized in *Cullison*, this inquiry is informed by the United States

3  Constitution.  *Id*. at 168; 584 P.2d at 1159.

4          It is axiomatic that a police officer must have probable cause before effecting an

5  arrest.  *See Brinegar v. United States*, 388 U.S. 160 (1949).  Probable cause requires a

6  showing, to a reasonable degree of certainty, not only that a crime has been committed, but

7  also that the person sought to be arrested actually committed the offense.  *Ybarra v. Illinois*,

8  444 U.S. 85, 91 (1979).  Probable cause exists where "facts and circumstances within the

9  officers' knowledge and of which they had reasonably trustworthy information are sufficient

10  in themselves to warrant a man of reasonable caution in the belief that" an offense has been

11  committed by the person under inquiry.  *Brinegar*, 338 U.S. at 175-76 (citation and internal

12  quotations omitted); *see Illinois v. Gates*, 462 U.S. 213, 231 (1983) (prescribing a "totality-

13  of-the-circumstances" approach directed to the "factual and practical considerations of

14  everyday life on which reasonable and prudent men, not legal technicians, act") (citation and

15  internal quotations omitted).  Probable cause is evaluated in light of the collective knowledge

16  of the law enforcement agency rather than the knowledge of a particular agent.  *United States*

17  *v. Rosario*, 543 F.2d 6, 8 (2d Cir. 1976).

18          In this case, there is no dispute as to the existence of conclusively exculpating

19  information in the possession of the Task Force analysts at the time of Plaintiff's indictment

20  and arrest.  It is also undisputed that the analysts failed to consider the exculpatory data

21  during the four months dedicated to that task.  As discussed above, a five to ten minute check

22  between Plaintiff's target folder and the Pen Link database would have revealed the critical

23  discrepancy between the home addresses contained therein.  That review in turn necessarily

24  would have led back to the subpoena return with its multiple unique identifiers proving

25  Plaintiff's innocence. The identity of the actual suspect was reasonably ascertainable by the

26  analysts at the time of Plaintiff's mistaken arrest.  It follows that the available evidence was

27  insufficient to justify a man of reasonable caution in believing Plaintiff was the wanted

28  narcotics co-conspirator.  Therefore, probable cause did not exist, as a matter of law, for

1    Plaintiff's arrest. *Watzek v. Walker*, 14 Ariz. App. 545, 548, 485 P.2d 3, 6 (Ct. App. 1971)

2    (Arizona police officer did not have probable cause to arrest plaintiff when that officer failed

3    to positively identify the suspect in violation of standard police investigatory practice);

4    *Schneider,* 749 A.2d at 336 (in action arising under 42 U.S.C. § 1983, New Jersey court held

5    that probable cause to arrest person innocent of charged offense did not exist when the police

6    officer identified the alleged suspect solely on the basis of a search of a DMV database using

7    only the suspect's name and information provided by an informant relating to the suspect's

8    physical appearance, likely place of residence, and criminal history); *cf. Dirienzo v. United

9    States*, 690 F. Supp. 1149 (D.Conn. 1988) (federal agents had probable cause to arrest

10   plaintiff based on eye-witness identifications and other reasonably trustworthy information,

11   which later turned out to be false).

12                              **iv.    Causation**

13          The United States contends that the grand jury's independent determination of

14   probable cause on January 10, 2002, shields the analysts from liability for their conduct prior

15   to that date. (Doc. # 61 at 14-15.) While the "chain of causation" might be broken by a

16   grand jury indictment on other facts, *Smiddy v. Varney*, 665 F.2d 261, 266-67 (9th Cir. 1981),

17   the presumption of independent prosecutorial judgment is of little moment here.

18          An Arizona grand jury indictment is "nothing more than an expression of the opinion

19   of at least nine people as to the credibility of evidence presented to it by the prosecutor."

20   *Reams v. City of Tucson*, 145 Ariz. 340, 343-44, 701 P.2d 598, 601-02 (Ct. App. 1985). The

21   prosecutor need not provide the grand jury with all the exculpatory evidence available to her.

22   Grand juries are not "in the business of holding minitrials"; their "primary function" is

23   "determining whether probable cause exists to believe that a crime has been committed and

24   that the individual being investigated was the one who committed it." *State v. Baumann*, 125

25   Ariz. 404, 408, 610 P.2d 38, 43 (1980).

26          In Plaintiff's case, however, prosecutor Billie Rosen did not present the grand jury

27   with any exculpatory evidence because she had no such evidence available to her. The

28   prosecutor relied upon Special Agent Carter to provide the link between the intercepted

1   criminal conduct and the person charged for that conduct.  Special Agent Carter furnished

2   the name of the suspect conclusively identified by the four intelligence analysts without

3   reference to the primary inculpatory data.  Considering all the evidence before them,

4   including the plainly exculpatory evidence readily at hand, the analysts did not have probable

5   cause to identify Plaintiff as the wanted narcotics co-conspirator.  But they did provide his

6   name to Special Agent Carter anyway.  The grand jurors deliberated upon the inaccurate

7   secondary evidence presented to them and indicted the wrong person.

8       The grossly negligent conduct that occurred at the third stage of the analysts'

9   investigation was the proximate cause of Plaintiff's mistaken indictment on January 10,

10   2002.  The Arizona Supreme Court has not considered whether law enforcement officers may

11   be personally liable under these circumstances.  However, the Supreme Court most likely

12   would not shelter the analysts from liability behind a facially valid grand jury indictment that

13   their gross negligence brought about.

14       As the United States Supreme Court has recognized, "tort liability makes a man

15   responsible for the natural consequences of his actions." *Malley v. Briggs*, 475 U.S. 334, 345

16   n.7 (1986) (intervening decision of a state judge to issue warrants for plaintiffs' arrest had

17   no effect on law enforcement officer's potential liability under 42 U.S.C. § 1983 for effecting

18   arrest of innocent persons without probable cause).  The analysts' grossly negligent

19   preparation of the Scott Kerns target folder and failure to consult either the Pen Link

20   database or the subpoena return are the functional equivalents of a "reckless omission or

21   fabrication of material information in [a warrant] application," which would "invalidate the

22   warrant and generate tort liability for the subsequent arrest." *Dirienzo*, 690 F. Supp. at 1154.

23   *Flores v. Dalman*, 199 Mich. App. 296, 502 N.W.2d 725 (1993), is to the same effect.  In that

24   case, a police officer who took no part in effecting the plaintiff's arrest was nevertheless

25   found liable in tort for informing the officer who actually obtained the arrest warrant that

26   plaintiff was the wanted suspect, even though he had abundant information to the contrary

27   in his possession.  Affirming a jury award, the *Flores* court held that a "police officer is not

28   shielded from liability by warrant where, because of the officer's failure to investigate or

22

1    disclose exculpatory information, probable cause for the issuance of the warrant may have

2    been lacking." 199 Mich. App. at 404, 502 N.W.2d at 729; *Osborne v. Rose*, 954 F. Supp.

3    1142, 1148 (W.D.Va. 1997), *rev'd in part*., *mem*., 133 F.3d 916 (4th Cir. 1998) ("An officer

4    who, in support of a warrant application, submits an affidavit with a reckless disregard for

5    the truth or with statements known to be false, may be held liable for a resulting false arrest

6    despite the issuance of a facially valid warrant.").

7        Because the decision by Arizona prosecutor Billie Rosen to charge Plaintiff with the

8    crimes actually committed by Scott Michael Kernes was made on the basis of the analysts'

9    reckless identification alone, the causal link between the analysts' gross negligence and

10   Plaintiff's arrest was not broken by the intervening grand jury indictment and issuance of a

11   facially valid arrest warrant.

12                              **v.    Damages**

13       The analysts' failure to check their final suspect identification against any primary

14   data was the cause-in-fact and the legal cause of the psychological and reputational injuries

15   for which Plaintiff now demands compensation.

16       **B.    False Arrest and False Imprisonment:  The Intentional Tort
              Exception to the Federal Tort Claims Act**

17
18       Plaintiff asserts an alternative theory of liability for false arrest and imprisonment.

     The United States is amenable to suit for these torts under 28 U.S.C. § 2680(h).  However,
19
     Plaintiff has not carried his burden of establishing that the false arrest proviso applies to the
20
     intelligence analysts who proximately caused his mistaken arrest.  This claim must therefore
21
     be rejected.
22
         Congress amended the Federal Tort Claims Act in 1974 to provide a remedy against
23
     the United States where law enforcement officers commit intentional torts while acting
24
     within the scope of their employment or under color of federal law.  S. Rep. No. 588, 93d
25
     Cong. 2d Sess. 2-3 (1974) (noting that Congress was motivated by several incidents in which
26
     federal narcotics agents engaged in "no-knock" raids in violation of the Fourth Amendment);
27
     *Wright v. United States*, 719 F.2d 1032, 1036 (9th Cir. 1983) (analyzing legislative history).
28

                                        23

The "intentional tort exception" adopted by Congress retains the immunity of the United States in cases involving:

> any claim arising out of . . . false imprisonment [or] false arrest . . . *provided*, that with regard to acts or omissions of investigative or law enforcement officers of the United States Government, the provisions of this chapter and section 1346(b) of this title shall apply to any claim arising . . . out of false imprisonment [or] false arrest.

28 U.S.C. § 2680(h).

The statute defines an investigative or law enforcement officer as "any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law." 28 U.S.C. § 2680(h); *Arnsberg v. United States*, 757 F.2d 971, 977 (9th Cir. 1984) (placing the burden on the plaintiff to satisfy the statutory prerequisite to intentional tort liability). Plaintiff has assumed, without explanation, that the analysts satisfy the threshold requirement throughout the course of this action. He has submitted no issue in his pleadings, in the joint pre-trial statement that superseded the pleadings, or evidence at trial as to whether the intelligence analysts are "empowered . . . to seize evidence," or are otherwise "investigative or law enforcement officers" for purposes of the Federal Tort Claims Act. The court inquired about the applicability of section 2680(h) to the intelligence analysts during closing arguments on December 14, 2006. Counsel acknowledged that the issue had not been presented.

As the *Arnsberg* decision makes clear, the United States may be liable under section 2680(h) only if its investigative or law enforcement *officers* committed the false imprisonment or false arrest. The court cannot guess as to whether the federal analysts meet this threshold definition. Because Plaintiff has not carried his burden under this section of the FTCA, his alternative theory of liability must be rejected.

## C.     The Discretionary Function Exception

As set forth above, the general waiver by the United States in the Federal Tort Claims Act of its sovereign immunity is subject to certain exceptions enumerated in 28 U.S.C. § 2680. The most far-reaching of these is the "discretionary function exception," 28 U.S.C. § 2680(a). This section retains the United States' immunity from suit as to "[a]ny claim

24

1   based upon an act or omission of an employee of the Government, exercising due care . . .

2   based upon the exercise or performance or the failure to exercise or perform a discretionary

3   function or duty on the part of a federal agency or an employee of the Government, whether

4   or not the discretion involved be abused." 28 U.S.C. § 2680(a). If the discretionary function

5   exception applies, "sovereign immunity is not waived, and no subject matter jurisdiction

6   exists." *Gen. Dynamics Corp. v. United States*, 139 F.3d 1280, 1283 (9th Cir. 1998).

7   Therefore, Plaintiff must "clear the discretionary function hurdle" in order to maintain his

8   action for grossly negligent police investigation under 28 U.S.C. § 1346(b)(1). *Gasho v.*

9   *United States*, 39 F.3d 1420, 1432 (9th Cir. 1994). While Plaintiff bears the initial burden

10  of proving subject matter jurisdiction under the FTCA, it should be noted that "the United

11  States bears the ultimate burden of proving the applicability of the discretionary function

12  exception." *Sabow*, 93 F.3d at 1451; *Vickers v. United States*, 228 F.3d 944, 950 (9th Cir.

13  2000) (same).

### 1.    Legislative Intent

15      Whether the discretionary function exception applies in this case turns on the purposes

16  the statute was designed to serve. The reported cases and commentary under the FTCA

17  establish that Congress enacted section 2680(a) to prevent its limited waiver of sovereign

18  immunity from impeding the pursuit of government policy-making. "The purpose of the

19  discretionary function exception is to prevent judicial second-guessing of legislative and

20  administrative decisions grounded in social, economic and political policy through the

21  medium of an action in tort." *United States v. Gaubert*, 499 U.S. 315, 323 (1991) (quoting

22  *United States v. Varig Airlines*, 467 U.S. 797, 814 (1984)); *see Dalehite v. United States*, 346

23  U.S. 15, 28 (1953) (surveying the legislative history of 28 U.S.C. § 2680(a) and concluding

24  that "it was not contemplated that the Government should be subject to liability arising from

25  acts of a governmental nature or function") *and Varig Airlines*, 467 U.S. at 813-14 (noting

26  that "whatever else the discretionary function exception may include, it plainly was intended

27  to encompass the discretionary acts of the Government acting in its role as a regulator of the

28  conduct of private individuals"). As the Court of Appeals for the Ninth Circuit recently

1    concluded, "[t]he discretionary function exception marks the boundary between Congress'
2    willingness to impose tort liability on the United States and the desire to protect certain
3    decision-making from judicial second-guessing." *Conrad v. United States*, 447 F.3d 760,
4    764 (9th Cir. 2006) (citation omitted).

5        Congress in enacting section 2680(a) was less than specific about the outer boundaries
6    of its liability exemption, however.  The statute does not define the term "discretionary
7    function."  Difficult line-drawing is required to determine whether the conduct challenged
8    in a specific case presents the type of "governmental decision-making" that Congress
9    intended to shield from judicial review, as "[v]irtually any government action can be traced
10   back to a policy decision of some kind." *Shansky v. United States*, 164 F.3d 688, 693 (1st
11   Cir. 1999).  In discharging their gate-keeping duties under 28 U.S.C. § 2680(a), the federal
12   courts have struggled to prevent the discretionary function exception from swallowing the
13   general rule of the waiver of sovereign immunity at 28 U.S.C. § 1346(b)(1).  *See Gen.*
14   *Dynamics Corp*., 139 F.3d at 1284 (noting statutory tension and refusing to shrink "the
15   exception to a mere formality"); *Smith v. United States*, 375 F.2d 243, 246 (5th Cir. 1967)
16   ("If the [FTCA] is to have corpuscular vitality to cover anything more than automobile
17   accidents in which governmental officials were driving, the federal courts must reject an
18   absolutist interpretation of [the discretionary function exception].""); *Zigler v. United States*,
19   954 F.2d 430, 432 (7th Cir. 1992) (finding that the discretionary function exception is merely
20   "shorthand for invoking a judicial responsibility for determining the scope of governmental
21   accountability for its conduct"); *Varig*, 467 U.S. at 813 (recognizing that it is
22   "unnecessary–and indeed impossible–to define with precision every contour of the
23   discretionary function exception").

24                    **2.    The Two-Prong Test**

25       Although they do not cut the Gordian Knot, the decisions of the Supreme Court in
26   *Varig Airlines*, *Berkovitz v. United States*, 486 U.S. 531 (1988), and *Gaubert* together set the
27   contours of the discretionary function exception as it now stands.  "In assessing whether the
28   discretionary function exception applies to a particular case, we look to the nature of the

1   conduct, rather than the status of the actor." *Conrad* 447 F.3d at 764 (citations and internal

2   quotations omitted).  The challenged conduct must be assessed in two ways.

3        "First, the question is whether the action taken by the government employee is a

4   matter of judgment." *Id*. at 764-65 (citation omitted).  Section 2680(a) is not implicated "if

5   there exists a statute, regulation or policy mandating particular conduct by a government

6   employee and the statute, regulation, or policy does not allow for the exercise of discretion

7   in fulfilling that mandate." *Id*. at 765.  "The exception will not apply in such a case because

8   the government employee will have no choice but to follow the mandatory directive." *Id*.

9   Merely establishing that "the government employee ha[d] a 'choice' regarding how to act in

10  a particular circumstance," and that the choice led to the events being litigated, is not

11  sufficient to invoke Congress' liability exemption, however.  *Cope v. Scott*, 45 F.3d 445, 448

12  (D.C. Cir. 1995).  As the reported decisions make clear, "not all actions that require

13  choice–actions that are, in one sense, 'discretionary'–are protected as 'discretionary

14  functions' under the FTCA." *Id*.

15       "[O]nce it has been determined that the challenged conduct involves an element of

16  discretion," the second question "is whether the discretion is the type of decision-making that

17  the discretionary function exception was designed to protect." *Conrad*, 447 F.3d at 765.  The

18  second step of the discretionary function test is designed to "prevent judicial second-guessing

19  of legislative and administrative decisions grounded in social, economic and political policy

20  through the medium of an action in tort." *Id*. (citation and internal quotations omitted).

21       *Gaubert* itself provides the paradigmatic example of conduct undertaken in the

22  absence of a specific proscription that is "grounded in policy" and therefore shielded from

23  review.  499 U.S. at 325.  In that case, the day-to-day decisions of federal bank regulators

24  regarding the management of a troubled savings and loan association were exempted from

25  judicial scrutiny because they "implicated social, economic, or political policies." *Id*. at 322.

26  The Court contrasted this policy-based conduct against the "garden-variety" discretion that

27  is not protected under section 2680(a):

28

> There are obviously discretionary acts performed by a Government agent that are within the scope of his employment but not within the discretionary function exception because these acts cannot be said to be based on the purposes that the regulatory regime seeks to accomplish. If one of the officials involved in this case drove an automobile on a mission connected with his official duties and negligently collided with another car, the exception would not apply. Although driving requires the constant exercise of discretion, the official's decisions in exercising that discretion can hardly be said to be grounded in regulatory policy.

*Id.* at 325 n.7.  In this important footnote, the Supreme Court acknowledged the core residuum of negligence that is not shielded from judicial scrutiny by Congress' far-reaching liability exemption.  *See Fang v. United States*, 140 F.3d 1238, 1242 (9th Cir. 1998) ("[T]he United States is *not* immune . . .when the claims do not concern actions which are the product of judgment driven by the consideration of competing policy-based choices.") (emphasis in original); *Indian Towing Co. v. United States*, 350 U.S. 61, 68-69 (careless maintenance of a lighthouse triggers liability); *Coulthurst v. United States*, 214 F.3d 106, 110 (2d Cir. 2000) (the failure to perform a diligent inspection of dangerous equipment out of laziness or because of careless inattentiveness is not shielded by the discretionary function exception).

The Supreme Court in *Gaubert* went on to state, however, that "[w]hen established governmental policy . . . allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." 499 U.S. at 324.  "The focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are *susceptible* to policy analysis."  *Id.* at 325 (emphasis added).  *Gaubert* creates a presumption of immunity when a federal employee takes action in the absence of a mandatory directive that, by its very nature, is "fraught with . . . public policy considerations."  *Cope*, 45 F.3d at 449 (citation and internal quotations omitted).  Thus, "the challenged decision need not actually be grounded in policy considerations so long as it is, by its nature, susceptible to a policy analysis."  *Vickers*, 228 F.3d at 951 (citation and internal quotations omitted).  A plaintiff may overcome this presumption only by establishing that

1  "the challenged actions are not the kind of conduct that can be said to be grounded in . . .

2  policy." *Gaubert*, 499 U.S. at 325.

3      The *Gaubert* analysis appears straightforward: injurious conduct that is both

4  discretionary and susceptible to policy analysis is presumptively shielded from judicial

5  review. But the discretionary function exception has no logical stopping point when stated

6  in the abstract. "To put the point in a more economistic way, virtually any action, public or

7  private, that purports to be rational reflects some form of cost-benefits analysis." Peter H.

8  Schuck & James J. Park, *The Discretionary Function Exception in the Second Circuit*, 20

9  Quinnipiac L. Rev. 55, 66 (2000). Thus, the *Gaubert* Court carefully noted the practical

10  limits of its holding by way of its negligent driving example. Discretionary decisions not

11  imbued with policy choices are susceptible to judicial review if otherwise actionable under

12  state law. To be immunized under section 2680(a), "the challenged action must itself entail

13  a policy choice, and it must be implemented in a manner consistent with the purposes of the

14  authorizing policy." Shuck and Park, *supra* at 73. Determining whether the conduct

15  challenged in a particular case falls within that core residuum of negligence requires careful

16  review of the operative facts. Conduct that is negligent, even grossly negligent, does not

17  perforce clear the discretionary function hurdle. *Vickers*, 228 F.3d at 950 ("Under the FTCA,

18  negligence in performing discretionary functions," however egregious, "is not actionable.").

19      The fact-intensive nature of the discretionary function inquiry is affirmed in the

20  reported cases. "For the discretionary function inquiry to have any meaning, it must be

21  applied to specific, concrete instances of conduct." *Coyne v. United States*, 270 F. Supp. 2d

22  104, 116 (D.Mass. 2003), *rev'd on other grounds*, 386 F.3d 280 (1st Cir. 2004). The Court

23  of Appeals for the First Circuit similarly concluded that "[u]nifying principles" may be

24  drawn from the decisional landscape, but the applicability of the discretionary function

25  exception is "not subject to resolution by the application of mathematically precise

26  formulae." *Shansky*, 164 F.3d at 693 (concluding that a "case-by-case approach is

27  required"). In light of these precedents, the court must determine whether there is any policy

28

justification that suffices, under the facts found above, to "prime the discretionary function pump." *Id*.

For the reasons set forth below, this case presents a rare instance in which section 2680(a) does not apply to shield the grossly negligent conduct of federal investigative officers.

### 3.  Step One:  The Analysts Exercised Discretion

The first step of the discretionary function test is satisfied because no "statute, regulation or policy" formally mandated that the analysts consider the data they collected in a particular manner.  The Special Agents in charge of Operation Green Prickly Pear instructed the four Task Force analysts to provide them investigative leads in the form of positive suspect identifications on the basis of the information gathered from the wiretap intercepts.  Special Agents Geohegan and Carter left the analysts free to come to their own conclusions about how best to fulfill that duty throughout the course of the Operation.  For example, the Task Force analysts were not required by any specific prescription to place a copy of the only direct link between the illegal conduct and the alleged perpetrator, the administrative subpoena return, in the controlling target folder.

### 4.  Step Two:  The Exercise of Discretion Is Not Shielded from Review

The challenged conduct, though discretionary, is nevertheless susceptible to judicial review.  As set forth above, a plaintiff may overcome the *Gaubert* presumption only by showing that the "challenged actions are not the kind of conduct that can be said to be grounded in the policy . . . regime."  499 U.S. at 325.  The focus of the inquiry is not on the "agent's subjective intent," but rather on the "nature of the actions taken and on whether they are susceptible to policy analysis."  *Id*.  Plaintiff has met this burden.

### i.  Section 2680(a) in Law Enforcement Investigations

It is well established that "decisions to investigate, or not, are at the core of law enforcement activity," and also that such judgment calls are "precisely the kind of policy-rooted decision making" that the discretionary function exception "was designed to safeguard."  *Kelly v. United States*, 924 F.2d 355, 362 (1st Cir. 1991).  As a general matter,

1   once the decision to investigate is made, "Congress did not intend to provide for judicial

2   review of the quality of the investigation as judged by its outcome." *Pooler v. United States*,

3   787 F.2d 868, 871 (3d Cir. 1986), *cert. denied*, 479 U.S. 849 (1986). "The sifting of

4   evidence, the weighing of significance, and the myriad other decisions made during

5   investigations plainly involve elements of judgment and choice." *Sloan v. Dep't of Hous.*

6   *and Urban Dev.*, 236 F.3d 756, 762 (D.C. Cir. 2001). Applying these principles, the court

7   in *Rourke v. United States* held that "claims based upon an erroneous decision to prosecute

8   a suspect later shown to be innocent of the crime for which he was arrested are not actionable

9   since the officers' decision to arrest and prosecute is a discretionary function of law

10  enforcement officers." 744 F. Supp. 100, 103 (D.Pa. 1988), *aff'd* 909 F.2d 1477 (3d Cir.

11  1990); *see also Littell v. United States*, 191 F. Supp. 2d 1338, 1345 (D.Fla. 2002) ("The

12  overwhelming consensus of federal case law establishes that criminal law enforcement

13  decisions–investigative and prosecutorial alike–are discretionary in nature, and therefore, by

14  Congressional mandate, immune from judicial review.") (citation and internal quotation

15  omitted).

16          The United States in its briefs and at trial urged the court to exempt the discretionary

17  conduct of its intelligence analysts from judicial review with citation to the broad holdings

18  of these cases and others like them. (Doc. # 61 at 11-13.) It cannot be denied that the

19  discretionary function exception applies with special force in the law enforcement context.

20  The negligence calculus may not be applied profitably to the discretionary decisions

21  involving unquantifiable policy variables that are the province of police officers and police

22  investigators. Were section 2680(a) not available to shield review, "law enforcement tactics

23  would become hesitant, apprehensive and less effective," *McElroy v. United States*, 861 F.

24  Supp. 585, 592 n.13 (D.Tex. 1994), and "every mistaken prosecution, however innocent, and,

25  indeed, every investigation which leads to a 'good' arrest but does not result in a conviction

26  would become a potential lawsuit." *Rourke*, 744 F. Supp. at 106. "Such a threat could not

27  help but have a deleterious effect upon law enforcement." *Id.*

28

1    But the discretionary function exception is a test, not a per se rule of governmental

2  immunity for all law enforcement activities involving judgment.    Accepting the

3  Government's contention would not only eviscerate the second step of the *Gaubert* analysis,

4  it would drain the Federal Tort Claims Act of its "corpuscular vitality" by permitting the

5  discretionary function exception to swallow the FTCA's waiver of sovereign immunity.

6  *Smith*, 375 F.2d at 246; *Cope*, 45 F.3d at 449.  "The mere presence of choice," even if it that

7  choice involves law enforcement, "does not trigger the exception." *Id*.  Therefore, the court

8  must determine whether the analysts' conduct can be said to be  "*grounded* in . . . policy."

9  *Gaubert*, 499 U.S. at 325 (emphasis added).  To be grounded in a policy, the decision must,

10  at a minimum, be consistent with it.  Shuck and Park, *supra* at 73.  The decisional landscape

11  upon which the Government so heavily relies informs the court's analysis, but the

12  applicability of the exception must turn on close consideration of the actual conduct that the

13  United States seeks to shield from judicial review.  A survey of this caselaw is instructive in

14  this regard.

15                      **ii.    The Reported Decisions**

16    The discretionary function exception has been applied to shield review of the

17  negligent investigation and arrest of a person later determined to be innocent of the charged

18  offense.  *E.g.*, *Pooler*, 787 F.2d at 869, 871 (Negligent methods chosen by a federal police

19  officer to investigate marijuana dealing at a federal hospital, such as the failure to "verify,

20  corroborate or surveil any of the drug transactions [culminating in the arrest]," were

21  discretionary functions because "Congress did not intend to provide for judicial review of

22  the quality of investigative efforts."); *Sabow*, 93 F.3d at 1452 n.6, 1453-54 (Police

23  investigators' mishandling, alteration, and failure to preserve physical evidence; failure to

24  obtain physical evidence such as finger nail scrapings; irregularities in the autopsy and

25  interviewing procedures; and failure to consider all the evidence were shielded from judicial

26  review because "[i]nvestigations by federal law enforcement officials . . . clearly require

27  investigative officers to consider relevant political and social circumstances in making

28  decisions about the nature and scope of a criminal investigation," and the types of "social and

1    political judgments that Congress meant to shield from FTCA challenges" were implicated

2    because "[t]he investigation . . . was potentially influenced by a specific, highly political

3    series of events . . . [and] intertwined with political and social considerations."); *Dueno v.*

4    *United States*, 165 F. Supp. 2d 71, 74 (D.P.R. 2001) (plaintiff's claim that IRS and FBI

5    agents negligently investigated and handled evidence barred by the discretionary function

6    exception); *Wright v. United States*, 963 F. Supp. 7 (D.D.C. 1997) (police officer's

7    intentional omission of relevant information in application for a search warrant not actionable

8    because the function of identifying what evidence to submit to a judicial tribunal is

9    discretionary).

10        Judicial review of negligence in the procurement of a search warrant by federal law

11    enforcement officers has also been foreclosed by the discretionary function exception,

12    especially when the error was occasioned by exigent circumstances. *E.g.*, *Doherty v. United*

13    *States*, 905 F. Supp. 54, 56 (D.Mass. 1995) (Federal officers tasked with the investigation of

14    an armed robbery erroneously applied for a warrant to search the home of a person with no

15    connection to the crime solely on the basis of evidence derived from a confidential

16    informant; the conduct was not reviewed because "law enforcement personnel made a

17    judgment based upon their discretion to seek a search warrant upon the information *which*

18    *they had at the time*," a decision "based upon the public policy of preventing crimes by acting

19    with expedition," that "cannot be inhibited by the threat of tort action based merely on

20    negligence . . . [as] the primary concern at the time . . . was preventing the criminals from

21    using or moving and secreting the firearms . . . [and] to move with dispatch to avoid any

22    further violent acts against the public.") (emphasis in original); *McElroy*, 861 F. Supp.

23    (negligence of federal narcotics officers in conducting surveillance and investigating

24    evidence, which led to a raid on the wrong residence and the detention of innocent persons,

25    held not actionable under the FTCA because the challenged decisions were grounded in

26    policy and made under exigent circumstances); *Mesa v. United States*, 123 F.3d 1435, 1438

27    (11th Cir. 1997) (DEA agents not liable for executing arrest warrant for *a* Pedro Pablo Mesa

28    against *the wrong* Pedro Pablo Mesa because "decisions regarding how to locate and identify

1    the suspect of an arrest warrant and regarding whether the person apprehended is in fact the

2    person named in the warrant are discretionary in nature and involve an element of judgment

3    or choice" such as the "urgency of apprehending the subject in light of such factors as the

4    potential threat the subject poses to public safety and the likelihood that the subject may

5    destroy evidence;" the "desire to keep the investigation secret for tactical reasons, to protect

6    confidential sources, [or] to protect agents involved;" and the optimal allocation of available

7    law enforcement resources.).

8                    **iii.    The Specific Facts of this Case**

9          The Government has not cited a case in which the discretionary function exception

10    has been applied to shield review of a federal agent's decision to blind himself to all of the

11    primary evidence that he himself solicited in favor of inherently unreliable secondary data

12    collected by somebody else. This conduct has no analogue in the reported decisions. To see

13    why, it is helpful to first establish what Plaintiff does not allege.

14          Plaintiff does not attack the intelligence analysts' "decision to investigate" an innocent

15    person, which decision is fully immunized by section 2680(a). *Kelley*, 924 F.2d. Plaintiff

16    does not challenge the "sifting of the evidence" or the "weighing of significance" that led to

17    the misidentification of Scott Curtis Kerns. *Sloan*, 236 F.3d at 762. There simply was no

18    deliberation between the two conflicting data sets. Judicial "review of the quality of the

19    investigation as judged by its outcome" is foreclosed by the discretionary function exception,

20    and Plaintiff does not request it. *Pooler*, 787 F.2d at 871. The liability-shielding policy

21    articulated in *Doherty*, preventing crimes by acting with expedition on the basis of

22    reasonably available evidence, is of little moment. Here there were no exigent circumstances

23    that could in any way inconvenience the analysts in reviewing the only inculpatory

24    information, which they collected and had available for the 97 persons they chose to indict.

25    Plaintiff does not second guess the analysts' allocation of the available law enforcement

26    resources. The analysts spent four months analyzing data to ensure that they provided the

27    correct name to Special Agent Carter for indictment.

28

1    Finally, Plaintiff does not impugn the analysts' choice of investigative methodology

2  in deciding what evidence to collect. *Sabow*, 93 F.3d.  What Plaintiff challenges is the

3  analysts' failure to consider when seeking indictment the very evidence that they deemed

4  important enough to request and from which all of their other evidence was derived.  As the

5  findings of fact make clear, the analysts ousted the telephone subpoena return persona in

6  favor of the DMV records persona without any plan, conscious justification, or reflection.

7  The analysts' total disregard of the only link between the criminal conduct and the person

8  responsible for that conduct was inconceivable to Special Agent Carter, and it is

9  inconceivable to the court as well.  Having determined that the subpoena return was essential

10  to their investigation, the analysts could not, consistent with that judgment, disregard it when

11  seeking indictment.

12    This conduct cannot be said to be *grounded* in a policy decision, for no conceivable

13  law enforcement interest could be furthered by the total abandonment of the primary

14  inculpatory and exculpatory data.  The analysts' omission, far from comporting with a policy

15  of reasonably reliable suspect identification, directly violated that policy.  "This amounts to

16  a claim of professional negligence, not failed policy judgment." *Coyne*, 270 F. Supp. at 117

17  n.5.  A discretionary decision (or non-decision) not to consider the essential data readily at

18  hand is not imbued with a policy choice.  Therefore, the analysts' omission is properly

19  analogized, not to the conduct of any of the law enforcement officers in the reported

20  decisions, but rather to the conduct of a government employee who, while driving his

21  automobile on a mission connected with his official duties, negligently collides with another

22  car. *Gaubert*, 499 U.S. at 325 n.7.

23    Having chosen to drive, a federal employee may not pass through a four-way

24  intersection, at full speed, without ever pausing to look for oncoming traffic.  Judicial review

25  of such a negligent exercise of driving discretion is appropriate because "these acts cannot

26  be said to be based on the purposes that the regulatory regime seeks to accomplish." *Id*.  In

27  like manner, having decided what critical identifying information to gather, the intelligence

28  analysts in this case may not blind themselves to their own policy choice by ignoring,

35

1    without justification or credible explanation, the very evidence that their policy provided

2    them. Investigating, like driving, requires the constant exercise of discretion. However, the

3    analysts are not protected by section 2680(a) because the grossly negligent choices they made

4    while exercising that discretion cannot be said to be grounded in law enforcement policy.

5        The finding of liability in this case will have no prospective effect on investigative

6    methodology or law enforcement procedure. This decision creates no incentive to change

7    existing police policy and will not cause law enforcement tactics to become "hesitant,

8    apprehensive and less effective." *McElroy*, 861 F. Supp. at 592 n.13. The court's decision

9    in no way impinges upon Arizona's stated policy of ensuring "continued vigorous police

10   work." *Landeros*, 171 Ariz. at 475, 831 P.2d at 851 (noting that the "active investigation and

11   prosecution of crime" often requires investigative agents to "make quick and important

12   decisions as to the course an investigation shall take"). The court merely holds that federal

13   agents, when conducting investigations in the absence of exigent circumstances, may not

14   refuse to look at what they know to be the most dispositive evidence they chose to collect.

15       The Government does not suggest that, had the analysts placed the subpoena return

16   in the target folder, they might have chosen to disregard the subscriber information

17   exculpating Plaintiff on the basis of a policy choice. No such deliberation occurred here.

18   Plaintiff challenges the analysts' total failure to consider the data that they themselves

19   subpoenaed at any time after using it to get a DMV photo. This conduct is at the extreme

20   edge of the continuum of investigatory discretion generally insulated from judicial review.

21   Unless the Federal Tort Claims Act is absolutely inapplicable in the law enforcement context,

22   the discretionary function exception cannot apply to shield this conduct from judicial review.

23       **D.    Entitlement to Relief**

24       Plaintiff is entitled to judgment against Defendant pursuant to 28 U.S.C. § 1346(b)(1)

25   in the amount of $200,000.00.

26       DATED this 21st day of February 2007.

27

28

_____
Neil V. Wake
United States District Judge

36